UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JEANANN HANISZEWSKI and
PAUL HANISZEWSKI,

              Plaintiffs,           03-CV-0812(Sr)

v.

LEE CADBY and NORTHEAST
DIVERSIFICATION, INC.,

              Defendants.

---

## DECISION AND ORDER

Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including the entry of final judgment. Dkt. #8.

Currently before the Court is defendants' motion for summary judgment dismissing plaintiffs' citizen suit alleging violations of the Clean Water Act for lack of standing and jurisdiction. Dkt. #10. For the following reasons, defendants' motion is granted in part and denied in part.

## BACKGROUND

Plaintiff Jeanann Haniszewski owns the real property at 936 Ransom Road which abuts the south eastern edge of defendants' property. Dkt. #15, ¶ 3. Ms.

Haniszewski affirms that she was born and raised on this property and has "enjoyed the wooded aesthetic value of the property, the peaceful running Plum Bottom Creek which traverses the property, the wild life that resided and could be seen on the property, and the overall quiet and peaceful tranquility of the property" for most of her life. Dkt. #15, ¶¶ 4-5. Ms. Haniszewski opines that "[d]efendants] have destroyed these values." Dkt. #15, ¶ 7. Ms. Haniszewski specifically complains of defendants' "dredging and filling of the wetlands" on the property, and affirms that this has caused "increased flooding on her property." Dkt. #15, ¶¶ 12 & 15.

Defendant Lee Cadby is President of Northeast Diversification, Inc., a corporation engaged in the business of paving and site development. Dkt. #10-2, ¶ 2. Mr. Cadby owns 20 acres of real property on Ransom Road in the Town of Lancaster. Dkt. #10-2, ¶ 3. The property is zoned for general industrial use. Dkt. #10-2, ¶ 4. Mr. Cadby intends to develop the property as an industrial park. Dkt. #10-2, ¶ 5.

Mr. Cadby engaged the services of Polka Engineering to prepare the site plan for the industrial park. Dkt. #10-2, ¶ 6. Polka Engineering engaged Earth Dimensions, Inc. to complete a wetlands delineation for the site. Dkt. #10-2, ¶ 17. The wetlands delineation report, dated March 5, 1996, was prepared to allow the U.S. Army Corps of Engineers ("Corps"), and New York State Department of Environmental Conservation ("NYSDEC"), to "determine the extent of the jurisdiction over the project, pursuant to Section 404 of the Clean Water Act and Article 24 (Freshwater Wetlands) of the New York State Environmental Conservation Law." Dkt. #19-2, p.3. Earth

Dimensions, Inc., identified five distinct wetlands on the site: (1) an isolated depressional wetland consisting of .060 acres; (2) an isolated depressional wetland consisting of .063 acres; (3) an isolated depressional wetland consisting of .225 acres; (4) an isolated depressional wetland consisting of .040 acres; and (5) a wetland drain consisting of 1.06 acres which traverses the southern portion of the site. Dkt. #19-2, p.iii. Earth Dimensions, Inc.

> determined that the project site contains a total of 1.448 [plus or minus] acres of wetlands which may be under Corps jurisdiction. It is the opinion of [Earth Dimensions, Inc.] that Polka Engineering should qualify for a Nationwide 26 permit[1] (if sought) for initiation and completion of the proposed development.

Dkt. #19-2, p.iii.

By resolution adopted May 6, 1996, the Lancaster Town Board approved the Cadby Industrial Site Plan. Dkt. #10-2, ¶ 24; Dkt. #10-4. Thereafter, the Lancaster Town Board approved the office building, maintenance building, roadway and utilities proposed for the site. Dkt. #10-2, ¶ 25.

Construction of the office building and storage facility began on or about April 21, 1997. Dkt. #10-2, ¶ 30. A certificate of occupancy for the office building and storage facility was granted by the Town of Lancaster Department of the Building Inspector on October 14, 1997. Dkt. #10-5.

---

[1] Nationwide Permit 26 was reissued on December 13, 1996 for a period of two years with somewhat different conditions, *e.g*.., threshold limits lowered from 10 to 3 acres and preconstruction/predischarge notification lowered from one to .3 acres, and thereafter extended until its expiration on June 7, 2000. *See* 61 Fed. Reg. 65, 874, 65,877, 65,891 & 65,895; 63 Fed. Reg. 36,040; 64 Fed. Reg. 39,252 & 39,260; 65 Fed. Reg. 12,818 & 14,255.

400 feet of 30-inch PVC pipe was installed at the south eastern portion of the site and covered with stone prior to April 1, 1999. Dkt. #10-2, ¶ 31; Dkt. #10-6. Mr. Cadby affirms that approximately 200 feet east of the pipe is a pre-existing 24 inch culvert which conveys water under Ransom Road and across plaintiffs' property toward the 30-inch PVC pipe. Dkt. #10-2, ¶ 35.

The Lancaster Town Board approved and accepted the roadway, sewer, water, gas, electricity, fire hydrant and lighting of the site by resolution adopted in May, 2000. Dkt. #10-2, ¶ 37; Dkt. #10-7.

On June 2, 2003, the Lancaster Town Board passed a resolution approving the construction of three single-story general industrial buildings on the site, subject to certain enumerated landscape modifications. Dkt. #10-2, ¶ 41; Dkt. #10-8.

On July 22, 2003, Mr. Cadby received a Notice of Intention to Sue pursuant to the citizen suit provision of the Clean Water Act. Dkt. #10-2, ¶ 43; Dkt. #10-9. The Notice of Intention to Sue sets forth two potential violations: (1) failure to obtain a National Pollution Discharge Elimination System ("NPDES"), Permit from the NYSDEC and to prepare and/or implement the Storm Water Pollution Prevention Plan ("SWPPP"),[2] required for such a permit; and (2) discharging dredged and/or fill

---

[2] The SWPPP "must include detailed descriptions of plans for erosion and sediment controls, monitoring and recordkeeping." *City of New York v. Anglebrook Ltd. P'ship.*, 891 F. Supp. 908, 914 (S.D.N.Y.), *aff'd*, 58 F.3d 35 (2d Cir. 1995) (per curiam). However, the regulations governing the contents of a SWPPP are "intended to be flexible rules which contemplate – and indeed require – applicants to exercise good engineering practices, informed by professional judgment and common sense." *Id.* at 915.

materials into the waters of the United States without obtaining a permit from the Corps. Dkt. #10-9.

On September 26, 2003, defendants received a Notice of Violation for Failure to Obtain Coverage Under SPDES[3] Permit GP-02-01 from the NYSDEC. Dkt. #10-2, ¶ 45. Specifically, the letter provides that:

> This [Notice of Violation] is issued because of your failure to obtain coverage under a SPDES permit before commencing construction activities including clearing, grading, and excavating that result in land disturbance of equal to or greater than one acre. NYCRR 750-1.4(a,b) requires that before commencing such construction activities an entity must obtain coverage under the SPDES General Permit for Construction Activities (Permit #GP-02-01)("The Permit"). Since you have begun such activities without coverage under the Permit, you must immediately stop all construction activities on the Site until you are issued coverage under SPDES General Permit GP-02-01. Your failure to comply with this notice will lead to additional enforcement by the Department.

Dkt. #10-10.

Mr. Cadby asked Bart Ciambello, P.E., doing business as America's Premier Engineer, the designer for the three single story general industrial buildings to be built on the site, to develop a narrative to accompany the storm water drawings which had been prepared by Polka Engineering but had not been filed with the Town of

---

[3] State Pollutant Discharge Elimination System ("SPDES"). A SPDES permit is the NYSDEC's equivalent to the NPDES. 33 U.S.C. § 1342(b) permits each state to implement the Clean Water Act through its own permit program as long as the program conforms to federal guidelines approved by the EPA administrator. *See Anglebrook Ltd.*, 891 F. Supp. at 913. The EPA administrator has authorized the NYSDEC to issue and enforce SPDES General Permits to discharge. *Id.*

Lancaster. Dkt. #10-2, ¶ ¶ 46-49. Mr. Ciambello affirms that he consulted with the NYSDEC as he was preparing this documentation and was advised that "the NYSDEC does not require submission of a SWPPP to the NYSDEC, they simply require that the plan be prepared and in place before construction commences." Dkt. #17, ¶ 7. Nonetheless, Mr. Ciambello asked Bill Smythe in the Water Department at the NYSDEC to review his plan and received assurances that the plan was acceptable. Dkt. #17, ¶ 9. Mr. Ciambello further affirms that the "SWPPP, the SPDES Permit, the building permit and the log required by the plan are maintained on site." Dkt. #17, ¶ 13. Mr. Ciambello also affirms that he has

> observed the drainage pipe at the southerly portion of the property and the site itself between November 2002 and the present time, on a consistent basis. The site itself is stable, the soils are stable, whatever siltation there is, is controlled and remains away from the wetland and there is no observable siltation in the wetland.

Dkt. #17, ¶ 18. Mr. Ciambello opines that

> I do know that many engineers believe that this kind of piping and cover actually protects the waterway from contamination and siltation when property is developed and the protected conduit operates to improve the quality of the water, rather than detract from it. In this instance, I believe that is the case.

Dkt. #17, ¶ 25.

On October 1, 2003, Mr. Cadby signed the Notice of Intent for Storm Water Discharges Associated With Construction Activity Under SPDES General Permit Number GP-02-01, which was delivered to the NYSDEC. Dkt. #10-2, ¶¶ 49-51; Dkt. #10-11.

By letter dated October 23, 2003, the NYSDEC acknowledged the Notice of Intent and authorized discharges five business days from October 21, 2003. Dkt. #10-2, ¶ 51; Dkt. #10-12. The authorization is specifically conditioned upon the development of an SWPPP "that complies with GP-02-01 which must be implemented as the first element of construction." Dkt. #10-12.

The Town Engineer for the Town of Lancaster, Robert H. Labenski, P.E., affirms that the "Cadby Industrial Park is an approved development in the Town of Lancaster which has gone through the normal approval process" and "is consistent with the zoning, has been the subject of State Environmental Quality Review and engineering review, public hearings and Town Board approval." Dkt. #31-2, ¶¶ 3-4. Mr. Labenski further affirms that the approved plans regarding the construction of the office buildings include "the installation of a pipe to conduct a seasonal flow of water through a small drainage ditch which flows through the industrial park from East to West." Dkt. #31-2, ¶ 10. Mr. Labenski further affirms that the Town of Lancaster subsequently required the installation of an additional twenty feet of pipe "to allow the Town access along an easement granted to the Town and over the drainage ditch which crosses the easement in the area of the easterly 20 feet." Dkt. #31-2, ¶¶ 10-11. Mr. Labenski affirms that the Town of Lancaster has inspected the construction and believes that "[s]iltation has been well controlled [and] the quality of the water in the ditch has been protected rather than harmed by the installation of the pipe." Dkt. #31-2, ¶ 13.

Plaintiffs' complaint asserts three causes of action pursuant to the citizen suit provisions of the Clean Water Act, 33 U.S.C. § 1365: (1) failure to obtain an SPDES Permit from the NYSDEC for the discharge of storm water, as required by 33 U.S.C. § 1342; (2) failure to prepare and/or implement an appropriate SWPPP as required by 33 U.S.C. § 1342; and (3) discharge of dredged and fill material into the waters of the United States without a permit in violation of 33 U.S.C. § 1344. Dkt. #1.

## DISCUSSION AND ANALYSIS

**Standing**

"Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986), *citing Marbury v. Madison*, 1 Cranch (5 U.S.) 137, 173-180, 2 L.Ed. 60 (1803). "Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984). The doctrines of standing, mootness, ripeness and political question all derive from this constitutional provision. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

To establish standing, the party invoking federal jurisdiction must demonstrate three elements: (1) an "injury in fact" or invasion of a legally protected interest which is "concrete and particularized" and "actual or imminent;" (2) a causal connection between the injury and the conduct complained of; and (3) it must be "likely" as opposed to merely "speculative" that the injury will be redressed by a favorable

decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). The injury in fact element focuses on injury to the plaintiff, rather than injury to the environment. *Friends of the Earth, Inc. v. Laidlaw Env. Servs., Inc.*, 528 U.S. 167, 181 (2000). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan,* 504 U.S. at 561.

First Cause of Action

The first cause of action asserts that defendants failed to obtain a SPDES permit for discharges of storm water from a construction site, in violation of 33 U.S.C. § 1342. Dkt. #1.

A citizen may commence suit to enforce this provision 60 days after providing notice of the alleged violation to the state and the alleged violator if the state has not commenced its own civil or criminal action against the alleged violator. 33 U.S.C. § 1365. "[T]he purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus . . . render unnecessary a citizen suit." *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 60 (1987). As a result, the United States Supreme Court has "held that citizens lack statutory standing under [33 U.S.C. § 1365(a)] to sue for violations that have ceased by the time the complaint is filed." *Friends of the Earth,* 528 U.S. at 175, *citing Gwaltney*, 484 U.S. at 56-63. Since the defendants obtained the SPDES permit for discharges of storm water beginning October 26, 2003, which was prior to the

commencement of this action on October 31, 2003, plaintiffs lack standing to raise this claim.

Second Cause of Action

Plaintiffs' second cause of action alleges that defendants have not developed and/or implemented an appropriate SWPPP, as required for a SPDES general permit. Dkt. #1.

33 U.S.C. § 1365(a)(1) authorizes a citizen suit against anyone alleged to be in violation of an effluent standard or limitation or, as relevant in the instant case, anyone alleged to be in violation of an order issued by the NYSDEC with respect to such a standard or limitation. 33 U.S.C. § 1365(f)(6) defines "effluent standard or limitation" as "a permit or condition thereof issued under section 1342 of this title . . . ." Thus, plaintiffs may utilize the citizen suit provision to commence an action against defendants for violating any condition of the SPDES permit, including the condition that defendants develop and implement a SWPPP. *See Patterson v. Barden & Robeson Corp.*, No. 04-CV-803, 2007 WL 542016, at *4 (W.D.N.Y. Feb. 16, 2007) (allowing suit for violating any condition of the SPDES, including the failure to implement the SWPPP by failing to properly utilize silt fencing and hay bales necessary for erosion control; improper lot level and seeding of a berm and other areas relative to stabilization; erosion and sediment migration into receiving waters; and failure to perform required weekly inspections by a qualified professional).

Plaintiff Jeanann Haniszewski and her son, Edward Haniszewski, have affirmed that defendants have failed to use storm water pollution prevention devices such as hay bales and silt fences to capture sediment-laden runoff; have failed to prevent erosion and vegetation damage; and have failed to excavate retention ponds in a timely manner so as to prevent runoff, and that such failures have contributed to increased flooding on their property. Dkt. #15, ¶ ¶ 12, 24 & 34; Dkt. #30, ¶¶ 18-19 & 23; Dkt. #32, ¶¶ 45-46. This satisfies the minimal requirements for standing. As a result, defendants' motion for summary judgment is denied with respect to the second cause of action.

Third Cause of Action

Plaintiffs' third cause of action alleges that defendants violated the Clean Water Act by discharging dredged and fill material into the waters of the United States without a permit. Dkt. #1. 33 U.S.C. § 1344 requires a permit for the discharge of dredged or fill material into the navigable waters of the United States. It is undisputed that defendants did not obtain or possess a permit to install 400 feet of 30-inch PVC pipe at the southern portion of the site and cover it with stone.

Defendants' counsel affirms that he contacted "Michelle Barczak, Esq. in the Counsel's Office and Gary McDannell in Enforcement" at the Corps and asked them what penalty would be imposed, assuming that a permit was required but had not been issued, for the installation of 400 feet of 30-inch PVC pipe. Dkt. #19. Defendants' counsel affirms that

> Gary McDannell indicated that the [filling] was so limited that nothing more than a "slap on the wrist" was likely. He explained that he meant only a warning and no remediation or penalty would be likely. He went on to explain that former Orchard Park Engineer Merritt, for example, usually required such pipes and fill as part of subdivision development plans to protect the water. This kind of filling was common and permits were granted absent unusual circumstances.
>
> . . . Michelle Barczak opined that the mere placement of that pipe did not trigger the requirement for a Clean Water Act permit (describing that as an anomaly) she went on to say that the filling of the adjacent wetland might require a permit. Where less than one acre was filled and the filling took place in the 90's, "the most" the Corps would require from someone who filled without a permit would be the construction of replacement wetland of the same size at another suitable location.

Dkt. #19, ¶ ¶ 6-7. Philip Frapwell, Chief of the Monitoring and Enforcement Section of the United States Engineer District Buffalo, affirms that if a discharge of fill would have been allowed pursuant to a Nationwide Permit and was in compliance with all conditions of the permit, no enforcement action would be taken. Dkt. #21, ¶ 7. If the conditions of the permit were not met, Mr. Frapwell affirms that the Corps would decline enforcement action so long as the project comes into compliance with the conditions of the permit. Dkt. #21, ¶ 8. The Corps would only consider alternative enforcement actions if compliance could not be achieved. Dkt. #21, ¶ 9.

Defendants argue that because the only remedy which would be imposed by the Corps, *i.e.*, construction of a replacement wetland somewhere else, would not redress plaintiffs' complaints of loss of aesthetics, plaintiffs lack standing. Dkt. #20, pp. 8-9.

The Court finds defendants' analysis inapposite inasmuch as the issue currently before the Court is not how the Corps would enforce a violation of 33 U.S.C. § 1344, but what remedy the Court could impose for a violation which the Corps has chosen not to prosecute. In that regard, the Court notes that "[t]he purpose of the citizen suit is to stop violations of the Clean Water Act that are not challenged by appropriate state and federal authorities." *Atlantic States Legal Found. v. Eastman Kodak*, 933 F.2d 124, 127 (2d Cir. 1991).

Plaintiff affirms that defendants' filling of the wetlands has contributed to increased flooding on her property. Dkt. #15, ¶ 12. That is sufficient to establish an injury in fact traceable to defendants. Moreover, the civil penalties available in a citizen suit "provide sufficient deterrence to support redressability." *Friends of the Earth,* 528 U.S. at 175; *see* U.S.C. § 1365(a) & 33 U.S.C. § 1319(d). Accordingly, plaintiffs have demonstrated standing to pursue the third cause of action.

**Jurisdiction**

Defendants argue that the drainage ditch at issue is not navigable water. Dkt. #31-3. Specifically, Mr. Cadby affirms that he does not believe that there is any connection between the drainage ditch and Plum Bottom Creek because the drainage ditch ends at an earthen dam supporting the abandoned Lehgih Valley railroad tracks. Dkt. #31, ¶¶ 7-10. As a result, Mr. Cadby affirms that he "believed that no permit was necessary." Dkt. #31, ¶ 11.

Plaintiffs submit a geological survey topographic map dated 1948 which purportedly depicts a stream which "matches exactly the course that Plaintiffs allege is in existence now, except for a brief underground detour through a conduit as it crosses the former Lehigh Valley Railroad track bed." Dkt. #33, ¶ 2. Plaintiff Jeanann Haniszewski's son, Edward Haniszewski, "an avid outdoorsman," affirms that it is his "understanding that the name given to the Creek [that] flows through Defendants' property and along the side property line at 936 Ransom Road is the North Branch of Plum Bottom Creek. " Dkt. #32, ¶ 6. He further affirms that "the Creek flows through Defendants' property, through the wooded area adjacent to Defendants' property and crosses the railroad beds to continue its flow south westward." Dkt. #33, ¶ 12. He also attaches photographs which he affirms "shows the Creek as it enters the mouth of a culvert positioned below the railway bed" and "allows the Creek to continue its south westward flow under the railway bed and eventually to the Buffalo River." Dkt. #33, ¶¶ 25-33.

In *Solid Waste Agency of Northern Cook Cty v. Army Corps of Engineers*, the United States Supreme Court rejected the Army Corps of Engineers' view of essentially limitless authority to regulate wetlands under the Clean Water Act. 531 U.S. 159 (2001). Thereafter, the Supreme Court addressed the Corps' jurisdiction in the specific context of a landowner who had filled wetlands located miles away from the nearest body of navigable water without a permit and a landowner denied a permit to deposit fill in a wetland which was separated from a drainage ditch by an impermeable berm. *Rapanos v. United States*, 547 U.S. 715 (2006). In a plurality opinion joined by

Chief Justice Roberts, Justice Thomas and Justice Alito, Justice Scalia decried that in applying the definition to ephemeral streams, wet meadows, storm sewers and culverts, directional sheet flow during storm events, drain tiles, man-made drainage ditches, and dry arroyos in the middle of the desert, the Corps had stretched the term "waters of the United States" beyond parody. *Id.* at 734. The plurality opinion concluded that:

> on its only plausible interpretation, the phrase "the waters of the United states" includes only those relatively permanent, standing or continuously flowing bodies of water "forming geographic features" that are described in ordinary parlance as "streams[,] . . . oceans, rivers, [and] lakes." The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall.

*Id.* at 739 (internal citation omitted). Given the difficulty of declaring where such waters end and land begins, the Supreme Court deferred to the Corps' "ecological judgment about the relationship between waters and their adjacent wetlands" to provide "an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act." *Id.* at 740-741.

> Therefore, only those wetlands with a continuous surface connection to bodies that are "waters of the United States" in their own right, so that there is no clear demarcation between "waters" and wetlands, are "adjacent to" such waters and covered by the Act. Wetlands with only an intermittent, physically remote hydrologic connection to "waters of the United States" do not implicate the boundary-drawing problem of *Riverside Bayview*, and thus lack the necessary connection to covered waters that we described as a "significant nexus" in *SWANCC*.

*Id.* at 742. Thus, establishing that wetlands are covered by the Clean Water Act requires two findings: (1) the adjacent channel constitutes waters of the United States,

*i.e.,* a relatively permanent body of water connected to traditional interstate navigable waters; and (2) the wetland has a continuous surface connection with that water, making it difficult to determine where the water ends and the wetland begins. *Id.* Justice Kennedy concurred in the judgment, opining that wetlands should be covered if they "possess a significant nexus with navigable waters." *Id.* at 787.

Utilizing the expansive interpretation of navigable waters in effect in 1996, Earth Dimensions, Inc., prepared a wetland delineation survey of the proposed industrial park to allow the Corps to determine the extent of their jurisdiction over the project. Dkt. #19-2, p.3. The report described the south eastern section of the property at issue as "a wetland drain." Dkt. #19-2, p.4. However, the portion of the report submitted for the Court's review does not permit the Court to conclude, as a matter of law, that this wetland drain falls outside the scope of the criteria set forth in the Supreme Court's 2006 decision in *Rapanos.* The submission of a topographical map (Exhibit CC), absent any explanation or opinion from an individual with expertise in interpreting such a document, is similarly unpersuasive. Accordingly, this aspect of defendants' motion is denied, without prejudice.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Dkt. #10), is granted with respect to the first cause of action and denied with respect to the second and third causes of action.

**SO ORDERED.**

**DATED:** **Buffalo, New York**
**September 29, 2009**

          <u>s/ H. Kenneth Schroeder, Jr.</u>
          **H. KENNETH SCHROEDER, JR.**
          **United States Magistrate Judge**