**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

───────────────────────────────

**JEANANN HANISZEWSKI and**
**PAUL HANISZEWSKI,**

                              **Plaintiffs,**                    **03-CV-0812(Sr)**

**v.**


**LEE CADBY and NORTHEAST**
**DIVERSIFICATION, INC.,**

                              **Defendants.**

───────────────────────────────


## DECISION AND ORDER

            Pursuant to 28 U.S.C. § 636(c), the parties have consented to the

assignment of this case to the undersigned to conduct all proceedings in this case,

including the entry of final judgment. Dkt. #8.


            Plaintiff's complaint, as limited by the Court's summary judgment decision

entered September 29, 2009 (Dkt. #37), asserts two causes of action pursuant to 33

U.S.C. § 1365, the citizen suit provisions of the Clean Water Act: (1) failure to prepare

and/or implement an appropriate Storm Water Pollution Prevention Plan ("SWPPP"), as

required by 33 U.S.C. § 1342; and (2) discharge of dredged and fill material into the

waters of the United States without a permit in violation of 33 U.S.C. § 1344.  Dkt. #1.

A non-jury trial was conducted on October 26-29 & November 17, 2010.

**FINDINGS OF FACT**

1.      Lee Cadby is the sole shareholder of Northeast Diversification, Inc., which performs asphalt paving, site work, landscaping, hydro seeding and installation of utilities, underground water, sanitary and storm systems.  Dkt. #61, p.4 & Dkt. #62, p.6.

2.      In 1994, Mr. Cadby purchased 20.27 acres of property zoned for industrial use on Ransom Road in Lancaster, New York.  Dkt. #61, p.5 & Dkt. #62, p.9.

3.      Mr. Cadby hired Polka Engineering to develop a site plan for  the Cadby Industrial Park.  Dkt. #62, p.9.  The site plan envisions an entrance road into the Cadby Industrial Park just north of 946 Ransom Road with 4 lots to the north of the entrance road, 2 lots to the west of the cul de sac at the end of the entrance road and 7 lots to the south of the entrance road.  Exh. 7.

4.      Paul Haniszewski resides at 946 Ransom Road, which is immediately south of the entrance road to Cadby Industrial Park and abuts the eastern border of the Cadby Industrial Park.  Dkt. #60, pp.42-43 & Exh. 159 & 160.

5.      Jeanann Haniszewski resides at 936 Ramsom Road, which is immediately south of Paul Haniszewski's residence and also abuts the eastern border of the Cadby Industrial Park.  Dkt. #60, p.88 & Exh. 159 & 160.

6.      Polka Engineering hired John Owens of Earth Dimensions, Inc., to prepare the wetland delineation.  Dkt. #62, p.10.  Mr. Owens is the principal author of Erie County's soil survey.  Dkt. #64, p.5.  He has a Master's degree in soil science from the University of Wisconsin and is completing his Doctorate degree in soil science from Cornell University.  Dkt. #64, pp.3-4.

7.      The wetland delineation, completed March 5, 1996 in accordance with the specifications of the U.S. Army Corps of Engineers Wetlands Delineation Manual (January 1987), identified approximately 1.448 acres of wetlands potentially under the jurisdiction of the U.S. Army Corps of Engineers.  Exhibit 1, pp.ii-iii. Specifically, Earth Dimensions identified four isolated depressional wetland areas and, as relevant to this lawsuit, 1.06 acres of wetland drain traversing the southern portion of the site.  Exhibit 1, p.iii.   A wetland drain is an area where water will collect and flow. Dkt. #64, p.10.

8      The wetland drain originates east of Ransom Road, flowing under Ransom Road through a 24 inch pipe and continuing west between Paul and Jeanann Haniszewski's properties before entering the Cadby Industial Park.  Exh. 8 & Dkt. #60, p.132 & Dkt. #64, p.11.  The wetland drain exits the southern border of the Cadby Industrial Park and disappears under ground into a manmade fill pile which was constructed prior to 1967 just north of the abandoned Lehigh Valley Railroad tracks. Exh. 26 & 27; Dkt. #64, pp.15-19; 25; 58-62; 115 & 117.

9.      The wetland drain is intermittent, *i.e.*, the surface flow is not continuous throughout the year.  Dkt. #61, p.91 & Dkt. #64, pp.13-19 & 115-116.

10.     A northern branch of Plum Bottom Creek crosses Ransom Road through a 5 foot diameter pipe further south of the wetland drain.  Exh. 10 & Dkt. #61, pp.53-56.

11.     The plan for the Cadby Industrial Park called for 0.593 acres of wetland to be filled.  Dkt. #64, p.23.  In 1996, when the wetland delineation was prepared, the nationwide permit allowed a landowner to impact up to one acre of jurisdictional wetlands without notifying or obtaining permission from the United States Department of the Army, Corps of Engineers ("Army Corps of Engineers").  Dkt. #64, pp.22-23 & 47-49.

12.     Polka Engineering completed a Storm Drainage and Utility Plan for the Cadby Industrial Park on March 27, 1996 which included the installation of approximately 390 feet of 30 inch diameter storm sewer pipe in the wetland drain at the eastern edge of the Cadby Industrial Park ("wetland drain pipe");  a storm water retention pond on the southern edge of lots 10-13, south of the wetland drain ("Storm Water Retention Pond C"); a storm water retention pond on the southern edge of lots 6 & 7, ("Storm Water Retention Pond B"); and a storm water retention pond on the western edge of lot 6 ("Storm Water Retention Pond A").  Exh. 7 & 8.

13.     The diameter of the wetland drain pipe was set at 30 inches so that its capacity would be larger than the 24 inch pipe under Ransom Road.  Dkt. #61, p.48.

14.     By letter dated April 9, 1996, the New York State Department of Environmental Conservation ("NYSDEC"), advised that:

> Since the project will involve five or more acres of soil disturbance, on-site storm water discharges are regulated by the Department under its recently issued State Pollution Discharge Elimination System ("SPDES"), General Permit for Storm water Discharge From Construction Activities.  The project sponsor is therefore required to file a Notice of Intent .
> . . .

Exh. 4.

15.     The Town of Lancaster issued a negative SEQRA declaration for the Cadby Industrial Park on April 15, 1996.  Exh. 5 & Dkt. #61, p.39.  The declaration noted that a SPDES General Permit for Discharge from Construction Activities was required.  Exh. 5.

16.     The Town of Lancaster approved the site plan for the Cadby Industrial Park on May 6, 1996.  Exh. 20 & Dkt. #61, p.41.

17.     Beginning in February of 1997, the nationwide permit allowed a landowner to impact one-third of an acre of jurisdictional wetlands without notifying the Army Corps of Engineers.  Dkt. #64, p.22 & 47.  If it was more than one-third of an acre,

the landowner was required to apply to the Army Corps of Engineers for permission. Dkt. #64, p.49.

18.     The Town of Lancaster issued a Certificate of Occupancy for the building on lot 1 of the Cadby Industrial Park, north of the entrance road to the Cadby Industrial Park,  occupied by Northeast Diversification, Inc., on April 21, 1997.  Exh. 19.

19.     On May 1, 2000, the Town of Lancaster approved and accepted the water line, storm sewers, pavements and curbs public improvement projects, including construction of Storm Water Retention Ponds A and B, completed at the Cadby Industrial Park.  Exh. 17 & 21 & Dkt. #61, pp.40 & 64.

20.     Storm water draining from the entrance road and lot 1 of the Cadby Industrial Park flows through 24 inch storm sewer pipes into Storm Water Retention Pond B and exits through a 12 inch outlet pipe to the wetland drain to the southeast, just before the wetland drain exits Cadby Industrial Park.  Exh. 8 & Dkt. #61, pp.74-76. The outlet pipe allows the water that drains into the retention pond to exit at a controlled rate into a vegetated swale at the wetland drain.  Dkt. #61, p.72 & Dkt. #63, p.115.

21.     The Town of Lancaster is responsible for maintaining the retention ponds and has access to them through storm drainage easements.  Dkt. #61, pp.67-68.

22.     Mr. Cadby hired Bart Ciambella, a licensed civil engineer with a bachelor of science in hydrology and an MBA, to develop plans for lots 12 and 13.  Dkt. #62, p.10 & Dkt. #63, p.4.

23.     The application for site plan approval to the Town of Lancaster, dated March 17, 2003, sought approval for four single story general industrial buildings with a combined square footage of under 20,000 square feet within zoning and site requirements of the previously approved industrial park.  Exh.13.  As relevant to the issues before the Court, the Engineering Report states that surface water would be collected via an 18 inch pipe and conveyed to a detention pond as previously approved. Exh. 13.

24.     On April 1, 2003, Mr. Ciambella submitted an updated site plan for three industrial buildings which shifted Storm Water Retention Pond C  slightly to the west.  Exh. 12; Dkt. #63, p.15.

25.     The Town of Lancaster approved the updated site plan on June 2, 2003.  Exh. 22 & Dkt. #61, pp.43 & 57.

26.     On July 22, 2003, plaintiffs provided Notice of Intent to Sue for failure to obtain SPDES coverage; failing to comply with SPDES permit requirements, including the requirement for a storm water pollution prevention plan; and filling of the

wetland drain without obtaining a permit from the United States Army Corps of Engineers.  Exh. 15.

27.     On August 7, 2003, the NYSDEC inspected the site and completed a Construction Storm water Inspection Report indicating the absence of a SPDES permit; the absence of a stabilized construction entrance and the presence of mud on the entrance road, but noting no evidence of turbidity in the receiving water; no evidence of sedimentation in the receiving water; no evidence of soil erosion at the construction site; adequate protection of adjoining properties and downstream waterways from erosion and sediment deposition due to storm water runoff from the construction site; properly functioning perimeter sediment control measures; and adequately stabilized storm water conveyance channels. Exh. 28 & Dkt. #61, p.132 & 134.  Although there had been a heavy rainfall during the morning and afternoon of the inspection, no flooding was observed and the water in the wetland drain was observed to be free of sediment.  Dkt. #61, p.135.

28.     By letter dated September 19, 2003, the NYSDEC advised plaintiffs' counsel that:

.

> As a result of your filing the Notice [of Intent to File Citizen Suit], the Department has investigated the allegations . . . as set forth in the Notice.  As a result of its investigation, the Department issued a Notice of Violation . . . to Cadby for starting construction activity without coverage under the Department's General Permit for Storm water Runoff from Construction Activities.  The Department is monitoring Cadby's attempts to come into compliance with the applicable storm water requirements.  Should Cadby fail to

come into compliance in the near future, the Department will initiate an enforcement action.  These actions by the Department should address your client's concerns as set forth in the Notice.

Exh. 16.

29.    On September 26, 2003, the NYSDEC issued a Notice of Violation for Failure to Obtain Coverage Under SPDES GP-02-01 prior to commencement of construction activities.  Exh. 23.  A notice of violation is a non-formal level of enforcement.  Dkt. #61, p.139.

30.    A Notice of Intent for Storm water Discharges Associated with Construction activity under SPDES GP-02-01 was filed on October 21, 2003.  Exh. 18. The Notice of Intent states that the Storm Water Pollution Prevention Plan would be in conformance with NYSDEC requirements.  Exh. 18.

31.    If a Notice of Intent indicates that the SWPPP is not in conformance with NYSDEC requirements, the SWPPP must be certified by a licensed professional stating that the SWPPP will ensure compliance with water quality standards.  Exh. 18. Nonconforming SWPPPs do not gain coverage for 60 days so as to allow the NYSDEC the option to review the SWPPP and, if warranted, direct the applicant to make changes to the SWPPP.  Exh. 18 & Dkt. #61, p.149.

32.    On October 23, 2003, the NYSDEC acknowledged receipt of the Notice of Intent and, absent further inquiry from the NYSDEC, authorized discharges in

accordance with GP-02-01 commencing 5 days after the filing of the Notice of Intent,

conditioned upon development of a SWPPP compliant with SPDES GP-02-01.  Exh. 24.

33.     Mr. Ciambella documented a SWPPP for Lots 12 & 13 of the Cadby

Industrial Park on December 16, 2003 and expanded the plan in the final version dated

February 14, 2004 to include the storm water pollution prevention measures that had

previously been implemented throughout the Cadby Industrial Park.  Exh. 17 & Dkt. #63,

pp.103-106.  Specifically, the SWPPP details that

> Development shall conform to the Erosion and Sediment
> Control Standards and Water Quality and Quantity Control
> measures which were approved as part of the overall
> development.  Individual Erosion and Sediment Control
> measures shall be in place during site development activities.
> These measures may consist of silt fencing at storm out falls
> and/or hay bales at drainage inlets in accordance with New
> York State Sediment and Erosion Control measures.  The
> Water Quantity control measures constructed as part of the
> overall development shall be maintained.  In addition, for site
> development activities to the south of Cadby Industrial Park
> road, a third pond shall be constructed in accordance with the
> approved Storm Drainage Calculations prior to developing
> the south side of the road.

Exh. 17.

34.     SPDES GP-02-01 requires the SWPPP to be signed and certified

by a corporate officer or duly authorized representative. Exh. 30, pp.19-20.

365     The SWPPP for the Cadby Industrial Park does not contain a

signature or certification.  Exh. 17 & Dkt. #63, pp.106-107.

36.     Mr. Ciambella met and conferred with the NYSDEC regarding the Cadby Industrial Park SWPPP and was not instructed to modify it.  Exh. 221 & 222; Dkt. #63, pp.13 & 108-111. Specifically, Mr. Ciambella showed the NYSDEC the Storm Drainage and Utility Plan and discussed whether the storm water retention ponds and vegetative swales were adequate.  Dkt. #63, pp.108-112.

37.     The storm water retention ponds at the Cadby Industrial Park are dry ponds, *i.e.*, they are not designed to hold water continuously.  Dkt. #61, p.105 & Dkt. #63, p.116.

38.     The New York State Storm Water Design Manual, dated August 2003, indicates that dry ponds are not currently deemed effective for stand-alone water quality treatment.  Exh. 29A, p.5-4 & Dkt. #61, p.161.  However, their use is appropriate in conjunction with storm water wetlands, infiltration practices, filtering practices and open channel practices, such as dry or wet swales.  Exh. 29A, p.5-3; Dkt. #61, pp.158, 160 & 176 & Dkt. #63, p.55.

39.     Storm Water Retention Pond C was constructed in approximately March of 2004. Dkt. #61, p.29.  Storm Water Retention Pond C is vegetated and water exits through a 12 inch outlet pipe into a vegetated swale at the wetland drain just west of the wetland drain pipe.  Exh. 8 & Dkt. #61, pp.72 & 76-77; Dkt. #63, pp.19, 68, 73 & 115.

40.     In approximately May of 2004, the Town of Lancaster requested that the wetland drain pipe be extended an additional 20 feet to the east so as to ensure the Town of Lancaster access to the Storm Water Retention Pond C via its storm drainage easement.  Dkt. #61, p.49 & Dkt. #62, p.4.  Thus, the wetland drain pipe extends to the eastern edge of the Cadby Industrial Park where the wetland drain borders Paul and Jeanann Haniszewski's properties.  Exh. 8.

41.     Jeanann Haniszewski complains that water collects at the wetland drain pipe and that the standing water attracts mosquitos and bugs, preventing her from being outside.  Dkt. #60, pp.98-99.

42.     Robert Labenski, engineer for the Town of Lancaster from 1992 to 2006 and responsible for reviewing development projects, including the Cadby Industrial Park, for conformance to town specifications and standards, opined that the wetland drain pipe ensures water flow and alleviates the potential for back up from tall weeds and debris, as found on the property owned by Paul and Jeanann Haniszewski.  Dkt. #61, pp.34-36, 49 & 81.

43.     Throughout Mr. Labenski's tenure as engineer, the Town of Lancaster never received any complaints regarding drainage issues at the site of the wetland drain pipe.  Dkt. #61, pp.46 & 48.

44.    By letter dated November 30, 2006, the Army Corps of Engineers advised Mr. Cadby that because the majority of fills which have occurred at the site since 1996 were authorized under previous nationwide permits and because of the existing site conditions, the Army Corps of Engineers was not pursuing enforcement action with respect to the installation of the wetland drain pipe.  Exh. 25.

## CONCLUSIONS OF LAW

1.    33 U.S.C. § 1365 authorizes a citizen suit against anyone alleged to be in violation of 33 U.S.C. § 1342 and 33 U.S.C. § 1344.

2.    33 U.S.C. § 1342 prohibits the discharge of any pollutant from any point source into the navigable waters of the United States without a permit issued by a federally approved SPDES permit system.  The NYSDEC is authorized by the EPA to administer a SPDES permit system in New York.  Exh. 31.

3.    33 U.S.C. § 1344 prohibits the discharge of dredged or fill material into navigable waters of the United States without a permit issued by the Army Corps of Engineers.

**Standing**

4.    "Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto."  *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541

(1986), *citing Marbury v. Madison*, 1 Cranch (5 U.S.) 137, 173-180, 2 L.Ed. 60 (1803).

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases'

and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984).  The doctrines of

standing, mootness, ripeness and political question all derive from this constitutional

provision.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).


5.      To establish standing, the party invoking federal jurisdiction must

demonstrate three elements: (1) an "injury in fact" or invasion of a legally protected

interest which is "concrete and particularized" and "actual or imminent;" (2) a causal

connection between the injury and the conduct complained of; and (3) it must be "likely"

as opposed to merely "speculative" that the injury will be redressed by a favorable

decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).


6.      "[E]ach element must be supported in the same way as any other

matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree

of evidence required at the successive stages of the litigation."  *Lujan, 504 U.S.* at 561.


7.      Paintiffs have failed to produce evidence of injury caused by

defendants SWPPP.  For example, plaintiffs proffered no evidence as to the impact of

storm water runoff through the dry ponds and vegetated swales upon the water quality of

the wetland drain, let alone evidence as to how any pollutants entering the wetland drain

downstream of plaintiffs property would impact any legally protected interest possessed

by plaintiffs.  *See Friends of the Earth, Inc. v. Laidlaw Env. Servs., Inc.*, 528 U.S. 167,

-14-

181 (2000) (The injury in fact element focuses on injury to the plaintiff, rather than injury to the environment.).  Accordingly, plaintiffs lack standing to pursue their claim pursuant to 33 U.S.C. § 1342.

8.      Plaintiffs' have similarly failed to produce evidence of injury caused by defendants' failure to obtain a permit for the installation of the wetland drain pipe, particularly in light of the fact that the Army Corps of Engineers found that the installation of the pipe was authorized under previous nationwide permits.  In any event, plaintiffs have proffered no evidence that the wetland drain pipe, as opposed to, for example, the vegetation contained in the wetland drain on plaintiffs property, was the cause of Jeanann Haniszewski's complaints of standing water in the wetland drain on plaintiffs' property.   Accordingly, plaintiffs lack standing to pursue their claim pursuant to 33 U.S.C. § 1344.

**Jurisdiction**

9.      Navigable waters is defined as "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).

10.      The EPA and the Army Corps of Engineers define waters of the United States as traditionally navigable waters and adjacent wetlands.  *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 216 (2d Cir. 2009).

11.     In *Solid Waste Agency of Northern Cook Cty v. Army Corps of Engineers* ("SWANCC"), the United States Supreme Court rejected the Army Corps of Engineers' view of essentially limitless authority to regulate wetlands under the Clean Water Act.  531 U.S. 159 (2001).  Thereafter, the Supreme Court addressed the Corps' jurisdiction in the specific context of a landowner who had filled wetlands located miles away from the nearest body of navigable water without a permit and a landowner denied a permit to deposit fill in a wetland which was separated from a drainage ditch by an impermeable berm.  *Rapanos v. United States*, 547 U.S. 715 (2006).  In a plurality opinion joined by Chief Justice Roberts, Justice Thomas and Justice Alito, Justice Scalia decried that in applying the definition to, *inter alia*, ephemeral streams, wet meadows, storm sewers and culverts, the Army Corps of Engineers had stretched the term "waters of the United States" beyond parody.  *Id.* at 734.  The plurality opinion concluded that:

> on its only plausible interpretation, the phrase "the waters of the United states" includes only those relatively permanent, standing or continuously flowing bodies of water "forming geographic features" that are described in ordinary parlance as "streams[,] . . . oceans, rivers, [and] lakes."  The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall.

*Id.* at 739 (internal citation omitted).  Given the difficulty of declaring where such waters end and land begins, the Supreme Court deferred to the Corps' "ecological judgment about the relationship between waters and their adjacent wetlands" to provide "an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act."  *Id.* at 740-741.

> Therefore, only those wetlands with a continuous surface connection to bodies that are "waters of the United States" in

> their own right, so that there is no clear demarcation between "waters" and wetlands, are "adjacent to" such waters and covered by the Act.  Wetlands with only an intermittent, physically remote hydrologic connection to "waters of the United States" do not implicate the boundary-drawing problem of *Riverside Bayview*, and thus lack the necessary connection to covered waters that we described as a "significant nexus" in *SWANCC*.

*Id.* at 742.  Thus, establishing that wetlands are covered by the Clean Water Act requires two findings: (1) the adjacent channel constitutes waters of the United States, *i.e.,* a relatively permanent body of water connected to traditional interstate navigable waters; and (2) the wetland has a continuous surface connection with that water, making it difficult to determine where the water ends and the wetland begins.  *Id.*  Justice Kennedy concurred in the judgment, opining that wetlands should be covered if they "possess a significant nexus with navigable waters."  *Id.* at 787.


12.     The wetland drain at the Cadby Industrial Park does not have a continuous surface connection to the Plum Bottom Creek or any tributary thereof.  The wetland drain is intermittent and disappears into the ground into a manmade fill pile just north of the Lehigh Valley Railroad tracks.  Therefore, the Court lacks jurisdiction over the alleged violations of the Clean Water Act.


**Costs**

13.     33 U.S.C.A. § 1365 provides that "[t]he court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate."

-17-

14.     "A prevailing defendant can recover fees only when the Court finds that the litigation was 'frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so.'"  *Atlantic States Legal Foundation, Inc. v. Onondaga Dep't of Drainage & Sanitation*, 899 F. Supp. 84, 87 (N.D.N.Y. 1995), *quoting Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 422 (1978).

15.     In light of defendants' failure to file a Notice of Intent to obtain SPDES coverage prior to construction and defendants' failure to obtain a permit from the Army Corps of Engineers to install the wetland drain pipe, as well as the changing case law regarding wetland jurisdiction, the Court does not find an award of attorneys' fees to defendants appropriate.

In accordance with the foregoing findings of fact and conclusions of law, set forth pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Clerk of the Court is directed to enter judgment in favor of the defendants in accordance with Rule 58 of the Federal Rules of Civil Procedure.

**SO ORDERED.**

DATED:     Buffalo, New York
            December 20, 2013

 s/ H. Kenneth Schroeder, Jr.
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**

-18-